IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PROFORM FINISHING PRODUCTS, LLC, f/k/a New NGC, Inc., d/b/a National Gypsum Company, and GOLD BOND BUILDING PRODUCTS, LLC, Plaintiffs, | ) | No. 19 C 3978 |
| v. | ) | Chicago, Illinois May 13, 2024 9:30 a.m. |
| ALPINEBAY, INC., Defendant. | ) | |

TRANSCRIPT OF PROCEEDINGS - MOTION HEARING
BEFORE THE HONORABLE JOHN F. KNESS

APPEARANCES:

For the Plaintiffs: MOORE & VAN ALLEN PLLC
BY: MS. KATHRYN GUSMER COLE
MS. KAITY YU EMERSON
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202

For the Defendant: LEXERO LAW
BY: MR. ERIC J. MENHART
512 C Street NE
Washington, DC 20002

Also Present: MR. HEYWOOD BOUKNIGHT

Court Reporter: MS. NANCY C. LABELLA
Official Court Reporter
219 S. Dearborn Street, Room 2128
Chicago, Illinois 60604
(312) 435-6890

(Proceedings held in open court:)

THE CLERK: 19 cv 3978, ProForm Finishing v. Alpinebay.

MR. MENHART: Good morning, your Honor. Eric Menhart on behalf of the defendants. Would you prefer us at the table or at the podium?

THE COURT: At the podium, please.

Good morning, Mr. Menhart.

MS. COLE: Good morning, your Honor. Kate Cole from Moore & Van Allen on behalf of the plaintiffs. Along here with me is Heyward Bouknight, assistant general counsel for National Gypsum, and my colleague Kaity Emerson.

THE COURT: And good morning to all of you.

Thank you for your patience. We had a slight delay with me and some courtroom equipment.

So we are here because there are several motions, motion to reinstate the case and then a motion to enforce the settlement agreement and for an order to show cause. And I've reviewed the materials. I have some questions. I am likely not going to issue a ruling today. I am going to suggest a path forward and we can see what you think about that.

The first thing I would like from you, Ms. Cole, is a quick summary of the items that you say -- the violations, other than the shade of pink that's at issue here. If you could tell me what aspects of the permanent injunction you

believe were violated and are still being violated.

MS. COLE: Absolutely, your Honor.

THE COURT: Thank you.

MS. COLE: As you will recall, the parties attempted to settle this case starting months, if not years, before the trial, with significant assistance from Magistrate Judge Fuentes. Those pretrial efforts were not successful. After trial, when the jury returned a verdict in National Gypsum's favor on all counts, the parties resumed settlement negotiations with Magistrate Fuentes' assistance.

The key term, of course, in all those negotiations was the one request National Gypsum made before it even filed this suit, which was that Alpinebay stop using purple. That was memorialized, as you know, in the settlement agreement and permanent injunction. And Alpinebay was given almost nine months after trial to stop using purple, to take down electronic marketing materials and the like.

But after that deadline for compliance, as you have probably seen in the brief, National Gypsum found that the original Purple YouTube video was still prominently linked on all of the Alpinebay's product pages for its niches.

Its original purple brochure, which the Court may recall extensive testimony about at trial, was still prominently linked on all of Alpinebay's product pages for its niches. Alpinebay's installation guide, warranty, use and care

manual, all bearing its original shade of purple, all still publicly accessible for Alpinebay's niches.

And then, of course, when it relaunched its product, after the February 2nd deadline for compliance, while under an order from this Court to choose a color that was not a shade of purple, having all the colors under the sun available to it, to simply pick one that wasn't purple, this is what Alpinebay chose (indicating).

THE COURT: Well, I'm going to come back to that point in a minute because that is perhaps the most -- perhaps the meatiest issue here.

But as to the Purple YouTube video, the Purple brochures, and the Purple manuals and guides, are those still being violated, those restrictions?

MS. COLE: As of the last time we've checked, I believe all of them have come down. I'm going to look at my colleague, who can confirm that for me.

We have not been refreshing every day, as you can imagine, the internet pages. But since the close of the briefing, I believe everything has been taken down.

THE COURT: Mr. Menhart made the point that the shade of pink that his clients are using is not listed in the purple family in the Pantone color scheme. I won't get the terminology right. I never did during trial. I won't now. But his argument, as I understand it, is that the pink color,

the pink shade, being used here isn't in the purple family in the Pantone color scheme.

Is that right?

MS. COLE: That's certainly the argument that they are raising.

THE COURT: In your view, does this pink fall within the Pantone definition of a purple color?

MS. COLE: In our view, your Honor, we are in a position now of having to come to the Court to police this and to talk about a pink because they started with a color that they themselves have conceded was purple. And then they changed it a little bit. And then they changed it a little bit more. We have seen at least three or four new shades from Alpinebay since the deadline for compliance.

So it's difficult for us to view this in a vacuum of just one color, since it appears that we're in a situation where they've been altering images, removing metadata from photographs, misrepresenting things to National Gypsum and the Court about what has been destroyed.

This is exactly why the Seventh Circuit permits courts in your Honor's position to employ the safe distance rule, so that the parties don't have to, in the words of the Seventh Circuit, interminably return to the Court to haggle about every change, every slight change in a mark.

THE COURT: Let me ask you, as a matter of determining

facts here, who determines whether this color is infringing? Is it going to be me now that there's a permanent injunction?

MS. COLE: So the question here is no longer infringement. The question here is whether there's simply been a violation of the settlement agreement.

THE COURT: I misspoke. Who is going to determine as a matter of fact whether this is any shade of purple?

MS. COLE: It -- we believe it's your Honor, the Court's determination.

THE COURT: All right. And in terms of the video, the brochures, and the owners' manuals and guides, assuming that those are now no longer out there, assuming that the violation is all now past, what is the remedy, if any, that you're seeking?

MS. COLE: Yes, your Honor. That's an important question. As a trademark owner, National Gypsum has an affirmative duty to police its trademark rights and cannot simply turn a blind eye to continuing infringement by an adjudicated willful infringer.

And so with respect to those issues, we ask that you send a message to Alpinebay that that was, in fact, a violation of the settlement agreement and of the permanent injunction.

And so for those points, we ask that your Honor enter an order confirming that there's been a breach of the settlement agreement. And to the extent you also find it

appropriate, we believe a contempt order is appropriate as well for violation of the permanent injunction.

THE COURT: So if I find a violation of the permanent injunction and then enter a finding of contempt, that's all you're asking for? Or are you asking for anything else?

MS. COLE: Well, along with a finding of the breach of the settlement agreement. We believe those are two separate issues, breach of the settlement agreement and a violation of the permanent injunction. And then as a remedy, we would ask that the Court award National Gypsum its attorney fees incurred in addressing these violations; and then under the safe distance rule, order that Alpinebay pick a new color that is far away from the margin line that --

THE COURT: Ms. Cole, I'm going to come to the color issue in a minute.

Right now I'm focusing only on the video, the brochures, and the other manuals and guides that you mentioned.

So for those three, you want me to find a violation of both the settlement agreement and the permanent injunction?

MS. COLE: Yes, your Honor, that's what we request.

THE COURT: And then you want a finding of contempt and then you want fees and costs basically, right?

MS. COLE: Yes, your Honor.

THE COURT: Okay. Let me stay on that theme for a moment and turn to Mr. Menhart and ask, do you agree that the

Purple YouTube video and the brochures and manuals existed after the effective date of the settlement agreement and the permanent injunction?

MR. MENHART: Your Honor, the answer is a general yes, with caveats for each individual category.

THE COURT: Go ahead.

MR. MENHART: Thank you.

The YouTube video is -- was not under the control of my client. It was a prior employee who had created the YouTube account and video upon his own volition for purposes of helping him to market the product when he was employed -- well, not employed, but he was a contractor of Alpinebay. He owned it all. It was not our client's at any time. Now, admittedly, the client knew the video was there. They linked to it back in the past. But the idea that that was something --

THE COURT: I'm sorry, that just makes absolutely no sense to me. Somebody is out there putting out YouTube videos about purple wall niches for fun? It's sort of like putting up the greatest hits of James Taylor kind of thing. I don't understand that.

MR. MENHART: Sure, your Honor. With respect, I don't think this is really atypical at all. If somebody is out there working as a contractor and they're trying to sell a product, they might --

THE COURT: Well, that's a key point. They were a

contractor.

MR. MENHART: Yes, correct.

THE COURT: Right. So I guess the question is why didn't your clients, who -- by the way, they got completely spanked in this trial. The jury didn't buy their argument one bit. I didn't think that they were particularly credible on the stand. You got a five-and-a-half-million-dollar jury verdict against you. It wasn't close.

So why were they out there not doing everything they possibly could to ensure that this case was behind them? That's what I don't understand.

MR. MENHART: Sure. And I think we're introducing some different subjects here. But to wrap up the YouTube video, we had no -- the client had no control over that YouTube account. They never did.

THE COURT: They had no control over their contractor?

MR. MENHART: The -- well, so, first and foremost, setting aside the employment issues, the contractor had worked for them ten years ago when the product was purple. And so at the time, it was an accurate reflection of what the product looked like.

THE COURT: Let me walk through it this way, Mr. Menhart, it may have been accurate at that time, but you agree that the video is down now, correct?

MR. MENHART: Yes.

THE COURT: Tell me how it happened that the video came down.

MR. MENHART: Sure. This demonstrates, in my opinion, the good faith that my client has undertaken. They didn't have any control over it, but they effectively took additional steps, that they didn't really have to take because it wasn't their property -- but they effectively went to YouTube and they submitted a copyright claim, effectively a DMCA claim, which bluntly probably wouldn't have held up. But they did it anyway in the interest of trying to get that video down. So they were successful in that respect. And they reached out to the contractor. The contractor didn't have the account --

THE COURT REPORTER: Counsel, please slow down.

MR. MENHART: The contractor didn't have the account. So the client took an additional step, an additional good-faith step, to work to get that down even though it wasn't under their control. So that's the YouTube component of this.

I'm happy to move on to the next component if your Honor is interested.

THE COURT: Yes, thank you.

MR. MENHART: Ms. Cole just held up this one particular image. That image was not great. I'm comfortable saying that. It was not great. And when it was raised -- Ms. Cole came to me as counsel. It was raised to me before this motion was filed. We gave Ms. Cole and her team

additional time to file this motion, and I think they asked for 30 days. We gave them up to 90. We said, look, we're more than happy to -- we're happy to hear you express your concerns. We're happy to, you know, adapt or adjust to the extent that we think it makes sense to do that. And we did that.

So this particular image was changed almost immediately. And Ms. Cole, with all due respect to her, has not actually put forward in any of her filings the actual product image now. So this product image is not an accurate reflection of what the product looks like. We took it down -- the client took it down upon being notified that the plaintiff had concerns. So that's that issue.

And then the third issue was effectively the website, right? And we admit, Alpinebay has control over that website, okay? The client prominently, on the front page of the website, the home page, Alpinebay.com, put under construction. We are not in any way, shape, or form promoting any products here. We are under construction. We are working on this website. And they have a support phone number and that's it. They took it all down. They didn't want any of the products to be displayed because they were working in the back end to make sure they were going to be in compliance. So that's what they did on the website.

Now, what the plaintiff has done here is they've effectively gone to third-party resources -- Google searches,

things of that sort -- and they've sort of worked their way from the back end of the website to find some of the material that my client clearly said, we do not want this to be displayed to the public. Front and center on their home page, Under construction; We're working on it. So that's what they did.

Then there was one final issue, which was the word purple. And, again, I want to make it perfectly clear here on the record, there's no evidence anywhere of my client using the word purple after the settlement agreement and the injunction.

This one instance was on a third-party website, homedepot.com, and it was left over from when the product was purple. It was buried in a database. My client didn't notice it. The second that the plaintiff raised it, we went in and we changed it. That was it.

So, in my opinion, those are the four issues that the Court has asked us to address right this second.

THE COURT: Has the monetary component of the settlement been paid, Ms. Cole?

MS. COLE: Yes, your Honor.

May I respond to a few of the points counsel raised?

THE COURT: Yes, after you answer one question, please. Do you have an image right now in color of the existing, the current wall niche that the defendants are selling?

MS. COLE: Yes. If you'll give me just a moment?

THE COURT: Thank you.

(Brief pause.)

MS. COLE: Your Honor, as best we can tell, it's this right here (indicating), which is Exhibit 4 to the declaration of Kaity Emerson filed with our motion to enforce.

THE COURT: Okay. Would you mind tendering that to the courtroom deputy?

MS. COLE: Sure. May I approach?

THE COURT: Yes, of course. Thank you.

(Tendered.)

(Brief pause.)

THE COURT: Do you know where this image falls on the Pantone scale, Ms. Cole?

MS. COLE: As best I know, I believe it is a Pantone shade that counsel actually raised with us before the settlement agreement was finalized and asked for National Gypsum's agreement that that constituted something other than a shade of purple. And we said, No, we don't agree. And counsel responded and said, Noted, thank you.

The parties then proceeded to sign the settlement agreement with Judge Fuentes' assistance. We dismissed the case, and this is what they launched.

THE COURT: One moment, please.

(Brief pause.)

THE COURT: Do you have any -- Ms. Cole, do you have any support in the Pantone scheme for saying that this is purple?

MS. COLE: No, your Honor. And that's largely because of what the law says about this situation. I sense that the Court might be struggling to determine, Is this a shade of purple? Is it pink? Where does it fall in the lines? And this is exactly what the Seventh Circuit discussed in Badger Meter and some of the other cases we've cited, like Scandia Down and the Hallowine case, that your Honor should not be in the position it's in right now trying to make these close calls.

THE COURT: I understand that and I am persuaded by that doctrine. But I'm also trying to -- well, judges make close calls all the time. So there will -- of course, if I find a violation here and order the plaintiff to change the color again, there's going to be some costs -- or defendant rather, there's going to be some costs to them. And I don't want to do that just willy-nilly, if you will.

But when I look at the two products side by side, it's clear that there's a significant difference. But I remember from this trial that -- I believe it was this trial -- that a side-by-side comparison is not really the way to go. I think we maybe even had a motion in limine about that or a jury instruction. I don't recall.

But when I look at the color -- I'll just be right upfront with you. While sitting out here on the bench, I went to my trusty computer and went to Google Images and I typed in "Barney the Purple Dinosaur." And this looks a lot like Barney's color. I'll even turn my computer around so that you can see.

It looks like Barney's color to me. And Barney is known as "the Purple Dinosaur."

So I think there is at least a colorable claim here that -- I'm going to tender this back to the courtroom deputy, this exhibit. Thank you.

(Tendered.)

THE COURT: There's at least a colorable claim here that there's been a violation.

What I'm going to do, because I really don't think that it's in the parties' best interests or the Court's best interest to keep having to deal with issues over the defendant's behavior in this case because, as I said, Mr. Menhart -- and I think you did a fine job at trial. You did the best you could with the facts that you were dealt. But this was not a close issue to me. There was a finding -- more importantly, it was not close to the jury's view. There was a finding of willful trademark infringement.

I'm going to, because of that, need, out of prudence, to carefully scrutinize the defendant's behavior. And it does

seem to me like there were a lot of other colors that the defendants could have picked other than this.

And I'll note for the record that my reference to Barney the Purple Dinosaur was not actually intended to be humorous or to be conclusive either, but just illustrative, which is that the color purple, in the ordinary understanding of how people view purple, has a fairly wide range. I'm not, again, making any finding here.

But there's another shade of purple that's known as Tyrian purple, T-y-r-i-a-n, that has a little bit of pink mixed in with it, I believe. That was actually a Roman color. It was, I believe, the color of Roman emperors' robes. And here's a painted swatch. I'll show this to counsel. That's Tyrian purple.

Can you see that, Mr. Menhart, from where you are?

MR. MENHART: I can see it.

THE COURT: Ms. Cole?

MS. COLE: Yes, your Honor.

THE COURT: That's also another form of purple. That looks to be fairly close to what I looked at earlier.

So the point of this little discourse is only to say that I think it's a colorable, if you will, claim by the plaintiff.

What I'm going to do is I'm sending you back to Magistrate Judge Fuentes on an expedited basis, and I'm going

to ask Magistrate Judge Fuentes to see if he has time to meet with all of you soon. If he doesn't, then I'll be forced into making a ruling here. But what I would like to do is get you all in front of Magistrate Judge Fuentes and see if there is an agreement that can be reached on a color going forward so that the defendants can go back into business and not have this issue hanging over their head; so that the plaintiffs can go back to their business and not have to keep expending resources over policing a willful infringer. I would hope that that can get resolved sooner than later. If not, then I'll be forced to make a decision.

I'm not entirely convinced that the color that the defendants are using now is violative. Again, I'm not saying one way or the other. But this needs to get resolved. So that's what I'm going to do.

I am likely to find that the other three categories of violations alleged did, in fact, happen. And I'm likely to find that that was contemptuous conduct and that, therefore, there's going to be some form of remedy in that regard. But that's something that Magistrate Judge Fuentes can deal with as well in the first instance. That's what I'm going to do.

Anything further, Ms. Cole?

MS. COLE: No, your Honor. If you'd like me to respond to any of the arguments counsel raised about the YouTube video and the website and whatnot, I'm happy to do so.

THE COURT: Not at this time, thank you.

Anything further?

MS. COLE: No, your Honor.

THE COURT: Mr. Menhart?

MR. MENHART: Your Honor, just for the record, we've stated in our papers the standards for contempt and standards for defining colors in settlement agreements and --

THE COURT: I'm glad you mentioned that because I did not understand your argument that the language in the settlement agreement "in any shade" -- it said "purple, in any shade" -- I think that was the language, right, Ms. Cole?

MS. COLE: Yes, your Honor.

THE COURT: I didn't quite understand why you were arguing that that was somehow inherently ambiguous or vague. I mean, you participated in drafting the language, right?

MR. MENHART: Yes.

THE COURT: It's a little late now to make that argument, isn't it?

MR. MENHART: Well, your Honor, we are not in here filing a motion for a finding of contempt. And so the standard is quite high.

THE COURT: But you were representing individuals who were going to be held to the contempt standard if they violated it. And if you thought that "purple, in any shade" was ambiguous, maybe the time to deal with that was before you had

your clients put their signature on the document, right?

MR. MENHART: Yes, sir. I think our response to that is that we don't think it's ambiguous. We think the only question to be determined here is whether or not this is a purple color --

THE COURT: Right. Now, you --

MR. MENHART: -- because --

THE COURT: -- don't think --

MR. MENHART: -- because --

THE COURT: Now you don't think that the language is ambiguous?

MR. MENHART: We -- just to be perfectly clear --

THE COURT: Please.

MR. MENHART: -- we think that the standard for contempt requires language that is unambiguous, all right? And so the concern that we have here is that we are not moving for a standard of contempt.

THE COURT: Right. So --

MR. MENHART: They are.

THE COURT: -- is the language ambiguous or is it not?

MR. MENHART: In our opinion, it's not ambiguous, as long -- the only thing that one would have to do is decide whether or not the color is purple. Period.

THE COURT: Right.

MR. MENHART: Yeah, that's it. But this whole idea

that we're starting to talk about -- you know, different shades or this, that, and the other thing -- is just not something that's in the agreement.

And something -- I want to be make something perfectly clear on the record, and I think it's important.

THE COURT: Well, we are on the record.

MR. MENHART: Right. Fair enough.

The reality here is that there are different things that one can do. And Ms. Cole just said at the very beginning of this hearing, they have the obligation to protect their mark. And so if they wanted to protect the mark in a more specific manner, they had the obligation to do that. And we put in our papers, there are many instance where other practitioners in other cases have used different standards for defining what the color is.

THE COURT: Okay.

MR. MENHART: That includes Pantone --

THE COURT: Thank you.

MR. MENHART: -- et cetera.

Thank you.

THE COURT: I'm not going to resolve this issue right now.

MR. MENHART: Understood.

THE COURT: I don't think that the argument that this is somehow ambiguous is going to persuade me, especially in

view of the fact that paragraph 14 of the settlement agreement says, "The parties to this agreement have cooperated in the drafting and preparation of this agreement. Therefore, this agreement shall not be construed against any party on the basis that the party was the drafter." The language is what it is. I've told you I think it's at least close to the line. And I may very well find that it violates the permanent injunction and the settlement agreement, "it" being be the color that your clients chose. But we'll see what happens in front of Magistrate Judge Fuentes.

Thank you all for coming in. We will move this case forward expeditiously. And have a safe trip back. Thank you.

MS. COLE: Thank you, your Honor.

MR. MENHART: Thank you, your Honor.

(Which were all the proceedings had.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Nancy C. LaBella* *May 29, 2024*
Official Court Reporter